# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **MICHAEL FIRESTONE, *et al.*,** | Case No. 3:24-cv-1034-SI |
| Plaintiffs, | **OPINION AND ORDER** |
| v. | |
| **JANET YELLEN, et al.**, | |
| Defendants. | |

Thomas R. Rask, III and Julie Parrish, KELL, ALTERMAN & RUNSTEIN, LLP, 520 SW Yamhill Street, Suite 600, Portland, OR 97204. Of Attorneys for Plaintiffs.

Natalie K. Wight, United States Attorney, and Michael J. Jeter, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, 1000 SW Third Ave., Suite 600, Portland, OR 97204. Of Attorneys for Defendants.

**Michael H. Simon, District Judge.**

Seven individuals challenge the constitutionality of the Corporate Transparency Act of 2021 ("CTA"), 31 U.S.C. § 5336, both facially and as applied.[1] Plaintiffs contend that the CTA

---

[1] The plaintiffs are Michael Firestone, Lindsay Berschauer, Katerina Eyre, Tayler Hayward, Lisa Ledson, Thomas Reilly, and Gerald Earl Cummings, II (collectively, "Plaintiffs"). Each alleges that they are subject to the reporting requirements of the CTA. Compl. ¶¶ 18-23 (ECF 1). The defendants are Janet Yellen, in her official capacity as Secretary of the U.S. Department of the Treasury; the U.S. Department of the Treasury; and Andrea Gacki, in her

exceeds Congress' authority under Article I of the United States Constitution, compels speech and interferes with associational rights in violation of the First Amendment, constitutes an unlawful search and seizure in violation of the Fourth Amendment, violates the Fifth Amendment's privilege against coerced self-incrimination, is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment, imposes excessive fines and cruel and unusual punishment in violation of the Eighth Amendment, infringes upon privacy rights protected by the Ninth Amendment, and interferes with the rights of States in violation of the Tenth Amendment. Plaintiffs allege only individual claims; they have not brought this lawsuit as a putative class action. *See* Compl. (ECF 1).

Pending before the Court is Plaintiffs' Motion for Preliminary Injunction. Plaintiffs, however, offer no evidence in support of their motion. Specifically, Plaintiffs have not provided any declarations, and their Complaint is not verified. Instead, Plaintiffs present their arguments as matters of law. For the reasons explained below, the Court finds that Plaintiffs have failed to show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable injury; and (3) that the balance of hardships tips sharply in their favor. Accordingly, the Court denies Plaintiffs' Motion for Preliminary Injunction.

## STANDARDS

### A.  Preliminary Injunctive Relief

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show

---

official capacity as Director of the Financial Crimes Enforcement Network, a bureau of the U.S. Department of the Treasury (collectively, "Defendants").

that: (1) the plaintiff is likely to succeed on the merits; (2) the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in favor of the plaintiff; and (4) an injunction is in the public interest.[2] *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *See All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "serious questions going to the merits and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132 (quotation marks omitted). Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).[3]

---

[2] When the government is the defendant, the third and fourth requirements merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

[3] In *Assurance Wireless USA, L.P. v. Reynolds*, 100 F.4th 1024 (9th Cir. 2024), the Ninth Circuit for the first time appears to have narrowed the "serious questions" test. In that case, the court stated: "This 'less demanding' merits standard requires serious *factual* questions that need to be resolved in the case." *Id.* at 1031 (emphasis added). None of the earlier cases cited in *Assurance Wireless*, however, expressly limited the "serious questions" test to serious "factual" questions. *Assurance Wireless* quoted *Manrique v. Kolc* to explain that "[s]erious questions are issues that "cannot be resolved one way or the other at the hearing on the injunction' because they require 'more *deliberative investigation*.'" *Id.* (quoting *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023) (emphasis added)). *Alliance for the Wild Rockies v. Petrick*, 68 F.4th 475 (9th Cir. 2023), cited in *Assurance Wireless*, also quoted this passage from *Manrique*. The quoted passage in *Manrique* itself quotes *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc). In the quoted passage from *Marcos*, however, the court stated: "For the purposes of injunctive relief, 'serious questions' refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any

### B. Facial and As-Applied Challenges

"A 'facial' challenge . . . means a claim that the law is 'invalid *in toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (quoting *Steffel v. Thompson*, 415 U.S. 452, 474 (1974)); *see also Bucklew v. Precythe*, 587 U.S. 119, 138 (2019) (explaining that "the facial/as-applied distinction affects the extent to which the invalidity of a statute need be demonstrated" (quotation marks omitted)); Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 CALIF. L. REV. 915, 925 (2011) [hereinafter, *Fact and Fiction*] (explaining that the Supreme Court generally describes "any challenge that does not seek to establish that a statute is totally invalid" as an "as-applied" challenge). Further, the term "facial attack" often includes only an attack on particular provisions or sections of a statute, even if a successful attack "could leave other aspects of [a]

_____

judgment by altering the status quo. *Serious questions are 'substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation.'" Id.* at 1362 (quoting *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738, 740 (2d Cir. 1952) (Frank, J.) (emphasis added)).

Further, as explained by Judge Jerome Frank in *Hamilton Watch*, which was decided before *Winter*, that quoted passage for when serious questions arise applies if the balance of hardships tips "decidedly" toward plaintiff. *Hamilton Watch*, 206 F.2d at 740. Judge Frank added: "The judge's *legal conclusions*, like his fact-findings, are subject to change after a full hearing and the opportunity for more mature deliberation." *Id.* at 742 (emphasis added). Thus, it appears that the "serious questions" test historically allowed *either* factual findings that were subject to later revision or "legal conclusions" that may change after "more mature deliberation" to suffice. Moreover, *Manrique* itself describes the serious questions standard as stating that a "movant must show serious *legal* questions going to the merits." 65 F.4th at 1041 (emphasis added) (quotation marks omitted). If the Ninth Circuit intended its recent decision in *Assurance Wireless* to change this result and, going forward, to restrict the "serious questions" test only to *factual* matters, the Ninth Circuit will assist district courts by making this point clearer. In the present case, however, this issue does not affect the resolution of the pending motion. As discussed below, the Court finds that Plaintiffs have not shown a likelihood of success on the merits, a likelihood of irreparable injury, or that the balance of hardships tips sharply in favor of Plaintiffs.

multipart enactment[] intact." *Fact and Fiction*, *supra*, at 925; *see also id.* at 925 n.36 (collecting cases).[4]

Thus, facial invalidation of legislation "is manifestly strong medicine" that should be employed "sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (quotation marks omitted); *see also Sabri v. United States*, 541 U.S. 600, 608 (2004) ("[F]acial challenges are best when infrequent."). Facial challenges are disfavored because, among other reasons, they "often rest on speculation" and therefore "raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri*, 541 U.S. at 609). In addition, facial challenges "run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (quotation marks omitted).  Facial challenges also "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.* at 451.

---

[4] Regarding "as-applied" challenges, Professor Fallon also explains:

> When the term "as-applied challenge" is treated as a residual category, encompassing every challenge to a statute or its applications that does not seek a holding of total, facial invalidity, terminological imprecision inevitably follows. It does so because when a challenger asks a court to hold a statute invalid in fewer than all applications, there can be a considerable range of choice about just how broadly a ruling of partial invalidity might sweep.

*Fact and Fiction* at 924; *see also* Richard H. Fallon, Jr., *As-Applied and Facial Challenges and Third-Party Standing*, 113 HARV. L. REV. 1321, 1321 (2000) ("Traditional thinking has long held that the normal if not exclusive mode of constitutional adjudication involves an as-applied challenge, in which a party argues that a statute cannot be applied to her because its application would violate her personal constitutional rights.") (footnote omitted).

Accordingly, a party raising a facial constitutional challenge confronts "a heavy burden." *Nat'l Endowment*, 524 U.S. at 580 (quotation marks omitted).

## C.  Standing to Assert Challenges on Behalf of Persons Not Before the Court

There also is a connection between "as-applied" challenges and standing. In general, a party lacks standing to challenge a law on the asserted ground that the law "would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609; *see also, e.g.*, *United States v. Van Hawkins*, 899 F.2d 852, 854 (9th Cir. 1990) ("Brown and Hawkins cannot establish a constitutional violation by asserting that the law is unclear with respect to those who distribute other, more exotic forms of cocaine; instead, they must demonstrate the statutes are vague in their case."). An exception, however, exists for claims of First Amendment overbreadth. "[O]verbreadth challenges call for relaxing familiar requirements of standing, to allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609. Plaintiffs, however, do not assert a claim of First Amendment overbreadth.

## OVERVIEW OF THE CORPORATE TRANSPARENCY ACT

Federal law has long prohibited money laundering, financing terrorism, evading taxes, and other harmful economic activities. *See, e.g.,* 18 U.S.C. §§ 1001, 1341, 1343, 1956, 1957, 2339C; 26 U.S.C. § 7201. Congress also has long sought to address financial crime through legislation. *See, e.g.*, Currency and Foreign Reporting Transactions Act of 1970 ("CFTRA"), Pub. L. No. 91-508, § 121, 84 Stat. 1114, 1116 (1970).[5] Despite these efforts, there remains a significant gap in the government's ability to detect and prosecute financial crime.

---

[5] Parts of the CFTRA and other statutes are referred to as the "Bank Secrecy Act" ("BSA"), codified at 12 U.S.C. §§ 1829b, 1951-60, and 31 U.S.C. §§ 5311-14, and 5316-36.

Under state law, "corporations, limited liability companies [("LLCs")], [and] other similar entities" are generally not required to disclose "information about the[ir] beneficial owners." National Defense Authorization Act of 2021 ("NDAA"), Pub. L. No. 116-283, § 6402(2), 134 Stat. 3388, 4604 (2021).[6] "A person forming a corporation or [LLC] within the United States" thus "typically provides less information at the time of incorporation than is needed to obtain a bank account or driver's license." H.R. Rep. No. 116-227, at 2 (2019). That enables "malign actors" to "conceal their ownership of corporations" and then use those anonymous corporations to engage in "money laundering," "the financing of terrorism," and "serious tax fraud." NDAA § 6402(3).

Criminals routinely exploit this information gap. Federal prosecutors report that "large-scale schemes that generate substantial proceeds for perpetrators and smaller white-collar cases alike routinely involve shell companies." Beneficial Ownership Information Reporting Requirements, 87 Fed. Reg. 59498, 59503 (Sept. 30, 2022) (quotation marks omitted).[7] Similarly, drug traffickers "commonly use shell and front companies to commingle illicit drug proceeds with legitimate revenue of front companies, thereby enabling the [traffickers] to launder their drug proceeds." *Id.*

In addition to facilitating domestic crime, the absence of company ownership information threatens U.S. national security and foreign policy interests. For example, "Russian elites, state-owned enterprises, and organized crime, as well as the Government of the Russian Federation

---

[6] Congress passed the Anti-Money Laundering Act of 2020 ("AMLA"), which includes the CTA, as part of the NDAA.

[7] "Shell companies" are entities "that have no physical presence beyond a mailing address, generate little to no independent economic value, and generally are created without disclosing their beneficial owners." 87 Fed. Reg. at 59501 (footnote omitted).

have attempted to use U.S. and non-U.S. shell companies to evade sanctions." *Id.* at 59498. The

Government of Iran has similarly deployed shell companies "to obfuscate the source of funds

and hide its involvement in efforts to generate revenue." *Id.* at 59502.

Criminals also can use the government's lack of information about the ownership of

corporations to obscure their income and assets and thus perpetrate "serious tax fraud." NDAA

§ 6402(3). A "Treasury study based on a statistically significant sample of adjudicated [Internal

Revenue Service ("IRS")] cases from 2016-2019 found legal entities were used in a substantial

proportion of the reviewed cases to perpetrate tax evasion and fraud." 87 Fed. Reg. at 59503

(quotation marks omitted). Moreover, because the United States has not previously collected

beneficial ownership information, it had fallen out of "compliance with international anti-money

laundering and countering the financing of terrorism standards." NDAA § 6402(5)(E).

To address this information gap, Congress enacted ownership reporting requirements.

The AMLA adopts various provisions designed to "modernize" federal "anti-money laundering"

laws and those "countering the financing of terrorism." NDAA § 6002(2). Among those

provisions is the CTA, which "establish[es] uniform beneficial ownership information reporting

requirements." *Id.* § 6002(5). In enacting the AMLA and the CTA, Congress explained that

"[f]ederal legislation providing for the collection of beneficial ownership information for

corporations, [LLCs], or other similar entities formed under the laws of the States is needed to"

among other purposes, "protect vital Unite[d] States national security interests," "protect

interstate and foreign commerce," and "better enable critical national security, intelligence, and

law enforcement efforts to counter money laundering, the financing of terrorism, and other illicit

activity." *Id.* § 6402(5).

Under the CTA, each "reporting company" must disclose to the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury, information about beneficial owners and applicants. 31 U.S.C. § 5336(b). A "reporting company" is "a corporation, [LLC], or other similar entity that is . . . (i) created by the filing of a document with a secretary of state or a similar office under the law of a State or Indian Tribe; or (ii) formed under the law of a foreign country and registered to do business in the United States by the filing of a document with a secretary of state or a similar office under the laws of a State or Indian Tribe." *Id.* § 5336(a)(11)(A).

Congress has exempted from the CTA's reporting requirements numerous categories of legal entities, including banks, public accounting firms, and other businesses that are already subject to other reporting or recordkeeping requirements. *See id.* § 5336(a)(11)(B). The CTA also excludes many domestically owned entities that no longer engaged in business. *See id.* § 5336(a)(11)(B)(xxiii). It also excludes many trusts, political organizations, and tax-exempt non-profits. *See id.* § 5336(a)(11)(B)(xix). Further, the CTA allows the federal government to exempt any other "entity or class of entities" for which reporting would not "serve the public interest" and "would not be highly useful" in "efforts to detect, prevent, or prosecute money laundering, the financing of terrorism . . . or other crimes." *Id.* § 5336(a)(11)(B)(xxiv).

In the CTA, Congress defined "beneficial owner" as "an individual who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise . . . (i) exercises substantial control over the entity; or (ii) owns or controls not less than 25 percent of the ownership interests of the entity." *Id.* § 5336(a)(3)(A); *but see id.* § 5336(a)(3)(B) (providing exemptions). The CTA defines "applicant" as the individual who files or directs the

filing of documents to create the corporate entity or, if foreign, registers it to do business in the United States. *Id.* § 5336(a)(2); 31 C.F.R. § 1010.380(e).

To comply with its statutory obligations, a reporting company must report the legal name, date of birth, residential or business address, and "unique identifying number from an acceptable identification document" of each beneficial owner and applicant. 31 U.S.C. § 5336(b)(2)(A); *see also* 31 C.F.R. § 1010.380(b)(1)(ii)(E) (requiring submission of image of identifying document from which the identifying number was obtained). If formed before January 1, 2024, a reporting company is not required to report applicant information, but it still must provide beneficial ownership information by January 1, 2025. 31 U.S.C. § 5336(b)(1)(B); 31 C.F.R. § 1010.380(a)(1)(iii), (b)(2)(iv). Reporting companies formed or registered during 2024 must provide beneficial ownership and applicant information within 90 days of notice of the entity's creation or registration. 31 U.S.C. § 5336(b)(1)(C); 31 C.F.R. § 1010.380(a)(1)(i)(A). For reporting companies created or registered after 2024, compliance will be required within 30 days of notice of formation. 31 C.F.R. § 1010.380(a)(1)(i)(B). Reporting companies must also disclose changes to beneficial ownership information within 30 days. 31 U.S.C. § 5336(b)(1)(D); 31 C.F.R. § 1010.380(a)(2)(i). Reporting violations that are "willful" may lead to civil or even criminal penalties. 31 U.S.C. § 5336(h); 87 Fed. Reg. at 59545-47.

In enacting the CTA, Congress sought to ensure that FinCEN would appropriately maintain the reported information. 31 U.S.C. § 5336(c)(3), (8). Such information is generally deemed "confidential and may not be disclosed" except as authorized by the CTA. *Id.* § 5336(c)(2)(A). For example, FinCEN may disclose beneficial ownership information after receiving a request "from a [f]ederal agency engaged in national security, intelligence, or law enforcement activity, for use in furtherance of such activity," or to "a State, local, or Tribal law

enforcement agency, if a court of competent jurisdiction . . . has authorized the law enforcement agency to seek the information in a criminal or civil investigation." *Id.* § 5336(c)(2)(B)(i).

In certain circumstances, FinCEN also may disclose beneficial ownership information to "a [f]ederal agency on behalf of a law enforcement agency, prosecutor, or judge of another country," or to "a [f]ederal functional regulator or other appropriate regulatory agency." *Id.* § 5336(c)(2)(B)(ii), (B)(iv), (C). In addition, if a reporting company consents, FinCEN may disclose its beneficial ownership information to certain financial institutions to assist those institutions in complying with their own legal requirements to conduct due diligence on their customers. *Id.* § 5336(c)(2)(B)(iii). FinCEN, however, may reject requests for beneficial ownership information, including for "good cause." *Id.* § 5336(c)(6).

Finally, under the CTA, 31 U.S.C. § 5336(b)(1), FinCEN issued in September 2022 a final rule concerning the reporting of beneficial ownership information. 87 Fed. Reg. 59498. In relevant part, this rule further defines the terms "beneficial owner," "substantial control," "ownership interests," "company applicant," "domestic reporting company," and "foreign reporting company." *Id.* at 59525-33, 59536-39.

## DISCUSSION

### A.  Whether Plaintiffs Have Shown a Likelihood of Success on the Merits

#### 1.  Plaintiffs' Challenge to Congress' Authority to Enact the CTA

Plaintiffs argue that the CTA exceeds Congress' authority under the Constitution. For two independent reasons, the Court concludes that Plaintiffs are unlikely to succeed on the merits of this argument. First, under the Commerce Clause (Article I, Section 8, Clause 3), Congress has broad authority to regulate interstate commerce and commerce involving foreign nations. This authority includes effectuating prohibitions on financial crimes, regulating enterprises subject to Congress' power under the Commerce Clause, and regulating the channels and

instrumentalities of interstate commerce. Second, under the Necessary and Proper Clause (Article I, Section 8, Clause 18), Congress has broad authority to effectuate the government's powers over national security and foreign affairs and to lay and collect taxes. The Court discusses each in turn.

### a.   Congress' Power Under the Commerce Clause

The Constitution grants Congress the power "[t]o regulate Commerce with foreign Nations, and among the several States." U.S. Const. art. I, § 8, cl. 3. "[T]he power to regulate commerce is the power to enact all appropriate legislation for its protection or advancement; to adopt measures to promote its growth and insure its safety; [and] to foster, protect, control, and restrain." *NLRB v. Jones & Laughlin Steel Corp*., 301 U.S. 1, 36-37 (1937) (quotation marks and citations omitted).

"The Supreme Court has identified three broad categories of activity that Congress may regulate under the Commerce Clause: (1) channels of interstate commerce; (2) instrumentalities of interstate commerce, or persons or things in interstate commerce; and (3) activities that substantially affect interstate commerce." *City of Spokane v. Fed. Nat. Mortg. Ass'n*, 775 F.3d 1113, 1116 (9th Cir. 2014) (citing *United States v. Lopez*, 514 U.S. 549, 558-59 (1995)). Regarding the third category, Supreme Court "case law firmly establishes Congress' power to regulate purely local activities that are part of an economic class of activities that have a substantial effect on interstate commerce." *Gonzales v. Raich*, 545 U.S. 1, 17 (2005) (quotation marks omitted). Further, "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id.* (quotation marks omitted). In addition, when reviewing such a determination, a court's "task . . . is a modest one." *Id.* at 22. A court "need not determine whether [the regulated] activities, taken in the aggregate, substantially

affect interstate commerce in fact, but only whether a 'rational basis' exists for so concluding." *Id.* (quoting *Lopez*, 514 U.S. at 557 (1995)).[8]

The CTA is directed at commercial entities (such as corporations and limited liability companies) that, in the aggregate, have a substantial effect on interstate and foreign commerce. Congress enacted the CTA as part of the Anti-Money Laundering Act of 2020, a regulatory scheme designed to combat money laundering, the financing of terrorism, and other illicit transactions that substantially affect the national economy. *See* Pub. L. No. 116-283, div. F, § 6002(2), 134 Stat. 4547, 4547 (2021). Included within the CTA's statutory framework are reporting requirements that prevent companies from engaging in transactions anonymously, a tactic, Congress has found, that criminals frequently use to evade detection. Congress also determined that these reporting requirements are "needed" to "better enable critical national security, intelligence, and law enforcement efforts" to fight financial crime and "protect interstate and foreign commerce." § 6402(5), 134 Stat. at 4604. Indeed, shell companies with no physical presence beyond a mailing address "can be used to conduct financial transactions while concealing the true beneficial owners' information." 87 Fed. Reg. 59501. In short, Congress

---

[8] In assessing the breadth of Congress' authority, the Supreme Court has distinguished between laws with an "apparent commercial character," *United States v. Morrison*, 529 U.S. 598, 611 & n.4 (2000)—such as regulations addressing the intrastate farming of wheat, *see Wickard v. Filburn*, 317 U.S. 111, 127-29 (1942), and the intrastate manufacture and possession of marijuana for personal use, *see Raich*, 545 U.S. at 15—and laws that have "nothing to do with 'commerce' or any sort of economic enterprise," *Lopez*, 514 U.S. at 561—such as prohibitions on possessing firearms in school zones and on gender-motivated violence, *see id.*; *Morrison*, 529 U.S. at 613. The Court has also drawn a distinction between regulations of commercial activity and regulations that would address inactivity by requiring individuals to engage in commercial transactions in which they would prefer not to engage. *See National Fed'n of Indep. Bus. v. Sebelius (NFIB)*, 567 U.S. 519, 553 (2012) (opinion of Roberts, C.J.); *id.* at 652 (Scalia, Kennedy, Thomas, and Alito, JJ., dissenting). The CTA imposes requirements only on entities with an apparent commercial character and does not require any individual to engage in a commercial transaction in which that person would prefer not to engage.

sought to deter money laundering, the financing of terrorism, and other illicit economic transactions that are facilitated through anonymous transactions by requiring entities with the capacity to engage in commerce to identify the human beings standing behind the corporate form. Thus, the CTA is within Congress' power to regulate interstate and foreign commerce.

### b. Congress' Power Under the Necessary and Proper Clause

Although the federal government was created with enumerated powers, "a government, entrusted with such powers must also be entrusted with ample means for their execution." *United States v. Comstock*, 560 U.S. 126, 133 (2010) (quotation marks omitted). Indeed, early in this nation's history Chief Justice John Marshall, writing for the Supreme Court, explained: "Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional." *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421 (1819).

"[I]n determining whether the Necessary and Proper Clause grants Congress the legislative authority to enact a particular federal statute, we look to see whether the statute constitutes a means that is rationally related to the implementation of a constitutionally enumerated power." *Comstock*, 560 U.S. at 134 (citing *Sabri*, 541 U.S. at 605). The Supreme Court "long ago rejected the view that the Necessary and Proper Clause demands that an Act of Congress be absolutely necessary to the exercise of an enumerated power." *Jinks v. Richland Cnty.*, 538 U.S. 456, 462 (2003) (emphasis and quotation marks omitted). Rather, the relevant question simply is whether a law is "convenient, or useful." *Comstock*, 560 U.S. at 133-34.

In addition to Congress' power to regulate interstate and foreign commerce, Congress also has the authority to tax, to regulate foreign affairs, and to protect national security. *See generally Legal Tender Cases*, 79 U.S. 457, 535 (1870) ("Congress has often exercised, without

question, powers that are not . . . ancillary to any single enumerated power," but that "aris[e]

from the aggregate powers of the government."); *id.* at 536 ("[A] power may exist as an aid to

the execution of an express power, or an aggregate of such powers."). As discussed, the power to

regulate interstate and foreign commerce is one of the enumerated powers of Congress, and

"[m]oney laundering is a quintessential economic activity." *See United States v. Goodwin*, 141

F.3d 394, 399 (2d Cir. 1997). The same is true of drug and human trafficking, fraud, sanctions

evasion, and other financial crimes targeted by the CTA. *See United States v. Rodriguez*, 360

F.3d 949, 959 (9th Cir. 2004) ("[N]arcotics trafficking is an economic activity with interstate

commerce implications."); *United States v. Lindsay*, 931 F.3d 852, 862 (9th Cir. 2019) (same

with human trafficking); *United States v. Jinian*, 725 F.3d 954, 968 (9th Cir. 2013) (same with

wire fraud). Congress prohibits these and other harmful forms of economic activity. *See, e.g.*, 18

U.S.C. §§ 1956, 1957 (money laundering); 18 U.S.C. § 2339C (terrorism financing); 26 U.S.C.

§ 7201 (tax evasion). Regarding taxes, Congress explicitly determined that corporate ownership

reporting requirements are "highly useful" to combatting tax fraud and other forms of tax

evasion. § 6402(8)(C), 134 Stat. at 4605.

Congress also promulgated the CTA under its authority over foreign affairs and national

security, which are national powers vested in both Congress and the President. The Necessary

and Proper Clause explicitly empowers Congress to carry into execution not only the powers

expressly delineated in Article I, but also "all other Powers vested by this Constitution in the

Government of the United States," including "Powers vested . . . in any Department or Officer."

U.S. Const. art. I, § 8, cl. 18. This clause authorizes congressional power over foreign affairs and

national security, *see United States v. Curtiss-Wright Exp. Corp*., 299 U.S. 304, 318 (1936), as

well as the President's powers to conduct "law enforcement," gather "intelligence," prevent

"terrorism," and safeguard "national security," § 6402(5)(D), 134 Stat. at 4604.

Congress concluded that the CTA's reporting requirements would "discourage the use of

shell corporations as a tool to disguise and move illicit funds" and would "assist national

security, intelligence, and law enforcement agencies with the pursuit of crimes." § 6002(5)(B),

(C), 134 Stat. at 4547-48. The Court does not find that Congress' conclusion was without a

rational basis. Further, courts "must accord substantial deference to the predictive judgments of

Congress." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997).

Congress' considered judgments must not be disturbed if Congress "has drawn

reasonable inferences based on substantial evidence." *Id.* In addition, in the sensitive area of

national security and foreign affairs, courts "lack . . . competence" in collecting evidence and

drawing factual inferences. *Holder v. Hum. L. Project*, 561 U.S. 1, 34 (2010). When the political

branches have "adequately substantiated their determination" that regulating conduct is

necessary to meet identified national security needs, courts must give "significant weight" to that

determination. *Id.* at 36. This Court has done so.

Further, in enacting the CTA, Congress amassed and evaluated vast amounts of data,

considering testimony, reports, and interests of various stakeholders—ranging from law

enforcement, the Executive Branch, foreign governments, intergovernmental expert bodies,

journalists, small businesses, multinational corporations, the U.S. Chamber of Commerce,

national security experts, international transparency organizations, the financial services

industry, and others. In addition, several committees and subcommittees held hearings. *See*

authorities cited in Brief of Senators Sheldon Whitehouse, Ron Wyden, Elizabeth Warren, Jack

Reed, and Representative Maxine Waters as *Amici Curiae* in Support of Defendants-Appellants

in *Nat'l Small Bus. United v. U.S. Dep't of the Treasury*, Case No. 24-10736, at 4-6 & nn. 4-12 (11th Cir.) Dkt. 30. Indeed, one of the CTA's lead sponsors repeatedly made the case that the United States was in a "clash of civilizations" between the rule of law and criminality and kleptocracy and was endangered in that clash by financial secrecy. *See, e.g.*, Tools of Transnat'l Repression: Hearing, Comm. on Sec. & Coop. in Eur., 116th Cong. 5 (2019). Based on this extensive record, Congress concluded that collecting beneficial ownership information is necessary to protect national security and promote U.S. interests abroad, regulate interstate and international commerce, and facilitate tax collection. Congress' determination is entitled to substantial deference from this Court. *Turner*, 520 U.S. at 195.

For the reasons stated above, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to their claim that the CTA exceeds Congress' constitutional authority.

### 2.  Plaintiffs' Challenge Under the First Amendment

Plaintiffs argue that the CTA violates their rights under the First Amendment in two respects. First, Plaintiffs contend that the CTA compels them to engage in speech with which they disagree, in violation of the compelled speech doctrine of the Speech Clause of the First Amendment. Second, Plaintiffs assert that the CTA interferes with their right freely to associate with whomever they please in violation of the First Amendment.

The compelled speech doctrine typically applies only when the government requires an individual publicly to convey a "particular message." *See, e.g.*, *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (invalidating State law requiring health care clinic to notify women that the State provides certain services, including abortion). The CTA, however, does not require Plaintiffs publicly to convey any particular message, let alone one with ideological implications. Thus, the compelled speech doctrine is not implicated. *See United*

PAGE 17 – OPINION AND ORDER

*States v. Sindel*, 53 F.3d 874, 878 (8th Cir. 1995) ("The IRS summons requires Sindel only to provide the government with information which his clients have given him voluntarily, not to disseminate publicly a message with which he disagrees."). Even if it were implicated, however, Plaintiffs' challenge still would likely fail. In light of the law enforcement, national security, and foreign policy objectives of the CTA, Congress has determined that the reporting of the information required under the CTA is "essential to the maintenance of effective government and orderly society[.]" *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 645 (1943) (Murphy, J., concurring). As noted, courts must afford Congress' evaluation substantial deference. *Turner*, 520 U.S. at 195.

In addition, Plaintiffs offer no evidence that someone would hesitate to become an owner of a company because the fact of their ownership would become known to the federal government or because the government may later use that information for a limited set of legitimate purposes. Plaintiffs' speculative and conclusory assertions that reporting beneficial ownership or control information will "deter . . . persons from exercising their rights of free speech and association and dissuade others from joining or assuming leadership positions," Compl. ¶ 72, are insufficient. *See Citizens United v. FEC*, 558 U.S. 310, 370 (2010) ("Citizens United, however, has offered no evidence that its members may face similar threats or reprisals."); *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) ("Allegations of a subjective chill are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm; the federal courts established pursuant to Article III of the Constitution do not render advisory opinions." (quotation marks omitted)). The pending case is unlike the situation in *NAACP v. State of Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958), in which the NAACP presented credible evidence "that on past occasions revelation of the identity of its rank-and-file

PAGE 18 – OPINION AND ORDER

members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, [or] other manifestations of public hostility." Indeed, as noted, Plaintiffs present no evidence at all.

Thus, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to their claim that the CTA violates the First Amendment.

### 3.   Plaintiffs' Challenge Under the Fourth Amendment

Plaintiffs contend that the CTA violates their rights under the Fourth Amendment. The Supreme Court, however, has recognized that reporting requirements of the kind at issue are not prohibited by the Fourth Amendment. In *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), the Court upheld a statute requiring banks to report to the federal government transactions greater than a specified dollar amount. *Id.* at 67; *see also* 31 U.S.C. § 5313. For each covered transaction, a bank must disclose the "name," "address," and "social security or taxpayer identification number" of "the individual presenting [the] transaction." *See, e.g.*, 31 C.F.R. § 1010.312. Congress explained that this information would be "highly useful in criminal, tax, or regulatory investigations." 31 U.S.C. § 5311(1). Because the relevant "information is sufficiently described and limited in nature, and sufficiently related to a tenable congressional determination as to improper use of transactions of that type," the Court concluded that the reporting requirements were reasonable under the Fourth Amendment. *Shultz*, 416 U.S. at 67. That conclusion reflects the well-established principle that where the government does not seek to make "non-consensual entries into areas not open to the public," and instead merely requires regulated entities to divulge certain records, the Fourth Amendment is more readily satisfied. *See Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 414 (1984).

Federal law requires taxpayers to file tax returns and other tax information, 26 U.S.C. §§ 6012, 6031-6060; employers to collect and make available information about new employees'

eligibility to work, *see* 8 U.S.C. § 1324a; and political campaigns to report contributions and expenditures, *see* 52 U.S.C. § 30104. As the Supreme Court explained, "reporting requirements are by no means per se violations of the Fourth Amendment," and "a contrary holding might well fly in the face of the settled . . . history of self-assessment of individual and corporate income taxes in the United States." *Shultz*, 416 U.S. at 59-60.

The CTA falls within the category of reasonable reporting requirements that courts have long understood as constitutional. As with the statute in *Shultz*, the CTA directs the disclosure of information that Congress explicitly identified as "highly useful" to combatting serious crimes. *See* § 6402(8)(C), 134 Stat. at 4605; 31 U.S.C. § 5311(1). Further, as discussed, Congress found that corporate ownership reporting requirements were "needed" to combat "the financing of terrorism" and to "protect vital United States national security interests." § 6402(5)(B), (D), 134 Stat. 4604. The CTA therefore serves government interests of the highest order.

At the same time, the CTA does not disturb any interest the Fourth Amendment protects. The statute does not involve "non-consensual entr[y] into areas not open to the public." *Donovan*, 464 U.S. at 414. Instead, it requires only that a business report an applicant or owner's name, date of birth, address, and "unique identifying number," such as a driver's license number. 31 U.S.C. § 5336(b)(2)(A). This information resembles what *Shultz* identified as "sufficiently described and limited in nature." 416 U.S. at 67. Plaintiffs argue that as beneficial owners or persons with substantial control of corporate entities, their interests are greater than those of the banks in *Schultz*, but as the Supreme Court explained in *Schutlz*, "neither incorporated nor unincorporated associations can plead an unqualified right to conduct their affairs in secret." *Id.* at 67-68 (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

Further, any asserted privacy interests are sufficiently protected by the statutory safeguards provided in the CTA. When FinCEN receives ownership information, it can only disclose that information to law enforcement and other entities in specified circumstances that sometimes require court authorization. *See* 31 U.S.C. § 5336(c)(2). Also, entities that receive ownership information from FinCEN must restrict access, implement security measures, and comply with many similar protocols. *See id.* § 5336(c)(3). Any individual who violates those protocols is subject to criminal and civil penalties. *See id.* § 5336(c)(4).

Thus, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to their claim that the CTA violates the Fourth Amendment.

### 4.  Plaintiffs' Self-Incrimination Challenge Under the Fifth Amendment

Plaintiffs allege that the CTA violates their Fifth Amendment privilege against coerced self-incrimination because it requires individuals to report activity that is illegal under federal law but permitted by Oregon law. *See* Compl. ¶¶ 47, 66. Plaintiffs argue in their motion, but do not allege in the Complaint that information gathered under the CTA could be used to enforce federal drug laws against owners of businesses involving cannabis or psilocybin that have been legalized under Oregon law. Plaintiffs also allege that individuals who are not in the country legally but who are allowed to register and operate lawful businesses under Oregon law will be required by the CTA to produce identification or potentially be deported. *Id.* ¶ 10.

Plaintiffs' assertions are speculative and too attenuated to establish standing or show a likelihood of success on the merits. The Fifth Amendment privilege is only properly invoked in the face of "a real and appreciable danger of self-incrimination." *McCoy v. Comm'r*, 696 F.2d 1234, 1236 (9th Cir. 1983) (quoting *United States v. Neff*, 615 F.2d 1235, 1239 (9th Cir. 1980)). "If the threat is remote, unlikely, or speculative, the privilege does not apply[.]" *Id.*

Plaintiffs do not identify a legal proceeding that poses an actual risk of self-incrimination nor do they show injury sufficient to confer standing.

Finally, Plaintiffs do not have standing to obtain relief on behalf of any non-party, hypothetical individual and cannot properly assert anecdotal concerns about other persons who might not comply with the CTA. As noted, Plaintiffs did not file this lawsuit as a putative class action, and they lack standing to challenge a law on the asserted ground "that the law would be unconstitutionally applied to different parties and different circumstances from those at hand." *Sabri*, 541 U.S. at 609.

Thus, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to their claim that the CTA coerces self-incrimination in violation of the Fifth Amendment.

### 5.  Plaintiffs' Vagueness Challenge Under the Fifth Amendment

Plaintiffs contend that the CTA is unconstitutionally vague in violation of the Due Process Clause of the Fifth Amendment. "A law is unconstitutionally vague if it does not give 'a person of ordinary intelligence fair notice of what is prohibited' or if it is 'so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Tucson v. City of Seattle*, 91 F.4th 1318, 1329 (9th Cir. 2024) (quoting *United States. v. Williams*, 553 U.S. 285, 304 (2008)). "The operative question under the fair notice theory is whether a reasonable person would know what is prohibited by the law." *Tingley v. Ferguson*, 47 F.4th 1055, 1089 (9th Cir. 2022); *see also United States v. Flores*, 63 F.3d 1342, 1373 (5th Cir. 1995) (rejecting argument "that the term 'substantial' is vague" and concluding that a "'substantiality' requirement is frequently encountered and readily understood"). Thus, Plaintiffs fail to satisfy this standard.

In addition, Plaintiffs allege that they are subject to the CTA's reporting requirements, and these allegations form the basis for Plaintiffs' contentions that the CTA violates their rights

under the First Amendment, the Fourth Amendment, the Eighth Amendment, the Ninth

Amendment, and the Self-Incrimination Clause of the Fifth Amendment. These allegations,

however, are inconsistent with Plaintiffs' vagueness argument. As a general proposition, "[o]ne

to whose conduct a statute clearly applies may not successfully challenge it for vagueness."

*United States v. Johnson*, 735 F.2d 373, 374 (9th Cir. 1984) (quoting *Parker v. Levy*, 417

U.S. 733, 756 (1974)). Although there may be exceptions to this principle, including when a First

Amendment overbreadth claim is asserted, Plaintiffs assert no such claim or otherwise explain

how this principle does not apply to them.

Finally, the CTA requires a finding of "willfulness" before a civil penalty or criminal

sanction may be imposed. Courts have generally held that such a willfulness requirement may be

sufficient to defeat a vagueness challenge. *See, e.g.*, *Screws v. United States*, 325 U.S. 91, 93

(1945); *see also Cal. Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1154 (9th Cir. 2001)

(collecting cases recognizing "that a scienter requirement may mitigate a law's vagueness,

especially with respect to the adequacy of notice to the complainant that his conduct is

proscribed").

For the reasons stated above, the Court concludes that Plaintiffs have not shown a

likelihood of success on the merits with respect to their claim that the CTA is unconstitutionally

vague in violation of the Due Process Clause of the Fifth Amendment.

### 6.  Plaintiffs' Challenge Under the Eighth Amendment

The CTA imposes a civil penalty for willful violations of "not more than $500 for each

day that the violation continues or has not been remedied." 31 U.S.C. § 5336(h)(3)(A). In

addition, a person "may be fined not more than $10,000, imprisoned for not more than 2 years,

or both." *Id.* Plaintiffs argue that these civil and criminal penalties constitute cruel and unusual

punishment or excessive fines in violation of the Eighth Amendment.

"The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *United States v. Bajakajian*, 524 U.S. 321, 334 (1998) (citations omitted). Thus, courts apply "the standard of gross disproportionality" to "compare the amount of the forfeiture to the gravity of the defendant's offense." *Id.* at 336-37. "[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336 (citations omitted). The Court owes "substantial deference to the broad authority" that Congress possesses in "determining the types and limits of punishments." *See id.* (quoting *Solem v. Helm*, 463 U.S. 277, 290 (1983)); *see also Blakely v. Washington*, 542 U.S. 296, 336 (2004) (Breyer, J., dissenting).

The Ninth Circuit has distilled the "gross proportionality" standard announced in *Bajakajian* into four factors: "(1) the nature and extent of the underlying offense; (2) whether the underlying offense related to other illegal activities; (3) whether other penalties may be imposed for the offense; and (4) the extent of the harm caused by the offense." *Pimentel v. City of Los Angeles*, 974 F.3d 917, 921 (9th Cir. 2020). "While these factors have been adopted and refined by subsequent case law in this circuit, *Bajakajian* itself 'does not mandate the consideration of any rigid set of factors.'" *Id.* at 921 (quoting *United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003)). As a threshold matter, Plaintiffs' claims are unripe and unsuitable for facial challenge because none of the Plaintiffs have been fined or prosecuted for violating the CTA, nor have Plaintiffs established a credible threat of such action sufficient to warrant a preliminary injunction. Indeed, each of the four *Bajakajian* factors are all but impossible to assess in the abstract, highlighting the difficulty of a pre-enforcement attack based on the Excessive Fines Clause.

Finally, the CTA's penalties are not excessive because they are not "grossly disproportional" to the gravity of the violation under the *Bajakajian* factors. In a facial challenge under the Eighth Amendment, Plaintiffs must show the penalty provisions at issue are "unconstitutional in all applications." *City of Los Angeles v. Patel*, 576 U.S. 409, 417 (2015). The CTA's penalty provisions, however, which can only be imposed based on "willful" violations, necessarily survive a facial challenge because the maximum penalty almost certainly will be constitutional in at least some circumstances.

For these reasons, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to their claim that the CTA imposes cruel or unusual punishment in violation of the Eighth Amendment.

### 7.  Plaintiffs' Challenge Under the Ninth Amendment

Plaintiffs argue that the CTA violates their right to privacy under the Ninth Amendment. The Ninth Amendment, however, does not confer substantive rights beyond those conferred by governing law. *See Strandberg v. City of Helena*, 791 F.2d 744, 748 (9th Cir. 1986) ("[T]he ninth amendment has never been recognized as independently securing any constitutional right, for purposes of pursuing a civil rights claim."). Thus, the Court concludes that Plaintiffs have not shown a likelihood of success on the merits with respect to their claim that the CTA violates the Ninth Amendment.

### 8.  Plaintiffs' Challenges Under the Tenth Amendment

As explained by the Ninth Circuit, "if Congress acts under one of its enumerated powers, there can be no violation of the Tenth Amendment." *United States v. Jones*, 231 F.3d 508, 515 (9th Cir. 2000). Because the Court has found that Plaintiffs have not shown a likelihood of success on the merits of their claim that the CTA exceeds Congress' constitutional authority under its enumerated powers to regulate interstate and foreign commerce, the Court concludes

that Plaintiffs similarly have not shown a likelihood of success on the merits with respect to their claim that the CTA violates the Tenth Amendment.

## B.  Whether Plaintiffs Have Shown a Likelihood of Irreparable Injury

To meet their burden for a preliminary injunction, Plaintiffs must "demonstrate that irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis omitted). Plaintiffs, however, offer no evidence, only speculation, which is insufficient. "Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Serv. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988). This is because a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing" that Plaintiffs are "entitled to such relief." *Winter*, 555 U.S. at 22. Further, courts may not presume irreparable harm; there must be a satisfactory showing supported with evidence. "No such thumb on the scales is warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Thus, the Court concludes that Plaintiffs have not shown a likelihood of irreparable injury.

## C.  Whether the Balance of Hardships Tips Sharply in Favor of Plaintiffs

To support a motion for preliminary injunction, a plaintiff must also establish "that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. As noted, when the government is the party defending against a motion for preliminary injunction, these factors merge. *See Nken*, 556 U.S. at 435. Both the balance of equities and the public interest disfavor a preliminary injunction.

When balancing the equities, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it." *Univ. of Haw. Pro. Assembly v. Cayetano*, 183 F.3d 1096, 1108 (9th Cir. 1999). A court must then weigh "the hardships of each party against one another." *Id.* "In exercising their sound discretion, courts of

equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (internal quotation marks omitted).

Because Plaintiffs cannot establish the first two factors necessary to obtain an injunction (likelihood of success on the merits and likelihood of irreparable harm), "it is clear they cannot make the corresponding strong showings [on the second two factors] required to tip the balance in their favor." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295 (D.C. Cir. 2009). As noted, Plaintiffs provide no evidence describing any hardships that they likely will suffer with the Court denies their motion for preliminary injunction, let alone how those hardships might be irreparable. As also noted, no Plaintiff currently is facing any prosecution or enforcement action.

Further, "any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (cleaned up). If this Court were to enjoin enforcement of the CTA it would interfere with Congress' judgment, supported by extensive factual findings, about how best to combat money laundering, the financing of terrorism, tax fraud, and other serious crimes that affect the national economy or national security. *See* NDAA § 6402(3). These considerations all weigh against granting a preliminary injunction and also do not show that the balance of hardships tips "sharply" in favor of the movants.

## CONCLUSION

For the reasons stated in this Opinion and Order, the Court DENIES Plaintiffs' Motion for Preliminary Injunction (ECF 3).

**IT IS SO ORDERED**.

DATED this 20th day of September, 2024.

/s/ *Michael H. Simon*
Michael H. Simon
United States District Judge